```
 1                   UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 2                         WESTERN SECTION

 3

 4
       United States of America    )
 5                                  )        15-mj-03054-KAR
       vs                           )
 6                                  )
       Alexander Ciccolo            )
 7     _____)

 8

 9            Transcript of Detention Hearing Held Before
               The Honorable Katherine A. Robertson,
10            United States District Court Magistrate,
                     on July 14, 2015.
11

12

13
       APPEARANCES:
14

15     For the government:  Kevin O'Regan, 300 State Street,
       Springfield, MA 01105.
16

17     Deepika Bains Shukla, 300 State Street, Springfield, MA
       01105.
18

19     For the defendant: David P. Hoose, Esq., 100 Main Street,
       Third Floor, Northampton, MA 01060.
20

21                     Alice Moran, CSR, RPR, RMR
22                  Official Federal Court Reporter
                       300 State Street, Room 303D
23                       Springfield, MA 01105
                 Tel: (413)731-0086  Fax: (413)737-7333
24                     alice.moran@verizon.net

25
```

1    **(Court commenced at 3:38.)**

2            THE COURT:  Please be seated.

3            THE CLERK:   The United States of America versus

4    Alexander Ciccolo, Magistrate Judge Number 15-03054.

5            THE COURT:   Counsel, would you identify

6    yourselves for the record please?

7            MR. O'REGAN:   Your Honor, for the United States

8    I'm Assistant United States Attorney Kevin O'Regan and

9    this is Assistant United States Attorney Deepika Bains

10   Shukla, and this is Special Agent Paul Ambrogio of the

11   Federal Bureau of Investigation.

12           THE COURT:   I apologize, we need to wait for the

13   defendant.

14           **(The defendant entered the courtroom.)**

15           MR. HOOSE:   Good afternoon, Your Honor.   David

16   Hoose for the defendant Alexander Ciccolo.

17           THE COURT:   Thank you very much.

18       This matter is here before the Court this afternoon

19   on request on a motion of the government to detain the

20   defendant pending the trial of this matter.

21       When I consider the government's motion, I am guided

22   by several general principles.   First, at all times this

23   defendant, who is only charged and charged by a complaint

24   at this stage, is entitled to the presumption of

25   innocence.   No finding that I make, no ruling that I make

1   today interferes in any way with that presumption of

2   innocence.  That remains in effect throughout the

3   remainder of these proceedings.

4        The purpose of this hearing is exclusively to

5   determine whether Mr. Ciccolo stays in detention pending

6   trial of any charges that's brought against him or whether

7   he is released pretrial.

8        Second, this is a proceeding under the Bail Reform

9   Act and generally I think it's fair to say that the

10  presumption is that there will be a release of somebody

11  pretrial unless I find that the government has proved

12  either by a preponderance of the evidence that there are

13  no conditions that would reasonably assure Mr. Ciccolo's

14  presence in this court during the further proceedings in

15  this case, or if I find that the government has proved by

16  clear and convincing evidence that there are no conditions

17  that will reasonably assure the safety of any person or of

18  the community if Mr. Ciccolo is released.

19       So those are the questions that are before us today.

20  Did the government intend to proceed by proffer or does

21  the government intend to put on evidence, Mr. O'Regan?

22            MR. O'REGAN:  Your Honor, we have already filed

23  a memorandum in support of our detention motion which has

24  attached an affidavit from Special Agent Ambrogio --

25            THE COURT:  Yes.

1          MR. O'REGAN:  -- laying out the facts with

2     respect to the case.

3          THE COURT:  Yes.

4          MR. O'REGAN:  We are prepared to call him as a

5     witness during the proceeding to testify and be subject to

6     cross-examination.  I've discussed this with Mr. Hoose and

7     he has agreed on behalf of the defendant that testimony

8     will not be necessary and that we will proceed on the

9     affidavit as if the affidavit were true just for the

10    purpose of this proceeding.

11         THE COURT:  All right.  So we will -- so, in

12    essence, then the government is proceeding by proffer and

13    by that I mean the affidavit that supports the memorandum

14    that the government has filed and the contents of the

15    memorandum, I think that would be the government's

16    proffer.

17       Is there any other evidence that the government

18    intends to offer this afternoon?

19         MR. O'REGAN:  Yes.  We have a recording of the

20    defendant's post-arrest statement.  After he was arrested

21    he was interviewed by Special Agent Ambrogio and

22    Supervisory Special Agent Julia Cowley, who's sitting all

23    the way at the end.  Those two special agents interviewed

24    him for about an hour and forty minutes and we would like

25    to play about nine minutes of that recording to supplement

1    our memo and affidavit.

2              THE COURT:  Has the defense been provided with

3    the portion of the statement that you want to play?

4              MR. O'REGAN:  Yes.

5              THE COURT:  Okay.  Does the defendant object to

6    having this portion of the statement played this

7    afternoon?

8              MR. HOOSE:  I do not, Your Honor.

9              THE COURT:  All right.  Thank you.

10        Are there any other exhibits or any other items of

11   evidence that the government is going to be introducing

12   this afternoon?

13             MR. O'REGAN:  No.

14             THE COURT:  Okay.  All right.  In that case why

15   don't you proceed with the portion of the -- with the

16   evidence that the government intends to put on this

17   afternoon.

18             MR. O'REGAN:  Your Honor, I have one other

19   procedural matter and that is the defendant is entitled to

20   a probable cause hearing within 14 days --

21             THE COURT:  Yes.

22             MR. O'REGAN:  -- of his initial appearance, and

23   I've also discussed that with Mr. Hoose and I believe the

24   defendant's position is that that will not be contested.

25             THE COURT:  In other words, either within 14

1   days or within 21 days of the initial appearance, Mr.

2   Ciccolo would be entitled to a preliminary hearing on

3   whether there is probable cause to believe that he

4   committed the offense with which he is charged.

5       His initial appearance was on July 6th.  If he were

6   to be detained, that preliminary hearing would be required

7   to be held and thus waived by the defendant by July 20th,

8   otherwise it would be within seven days.

9       In any event, we're coming up to the deadline for

10   holding that hearing and given that we are taking some

11   evidence this afternoon, Mr. Hoose, it would be I think

12   helpful to combine the detention hearing and the

13   preliminary hearing if the defendant does not object.

14          MR. HOOSE:  The defendant does not object, Your

15   Honor.  I explained to Mr. Ciccolo earlier that while he

16   was entitled to a 5.1 hearing, that basically the scope of

17   that hearing was going to be identical to what the Court

18   was going to hear today and there was really no point in

19   us coming back here and going through that exercise again.

20   He's in agreement with me and we would be content to

21   combine both issues for purposes of today.

22          THE COURT:  Thank you.  I think that is an

23   efficient way to proceed.  I appreciate that.  Why don't

24   we proceed with taking evidence.

25          MR. O'REGAN:  Ms. Shukla is going to present the

```
1    recording.  It's about nine minutes.
2              THE COURT:  Thank you.
3              MS. SHUKLA:  Your Honor, the defendant has also
4    agreed that we don't have to call a witness to
5    authenticate the video.
6              THE COURT:  All right.
7              MS. SHUKLA:  Ms. Calderon, if you could put the
8    volume as high as it can go?
9                        (Video playing.)
10             MR. O'REGAN:  With that, that concludes the clip
11   of that interview that we are offering into evidence, Your
12   Honor.
13             THE COURT:  And if I understood you correctly,
14   there's no other evidence that the government wishes to
15   present this afternoon, is that right?
16             MR. O'REGAN:  That's right.
17             THE COURT:  Mr. Hoose, does the defendant want
18   to present anything this afternoon?
19             MR. HOOSE:  I have no evidence to present, Your
20   Honor.  I want to be heard on argument as to whether there
21   are conditions that could be set that would ensure his
22   release and safety in the community.
23             THE COURT:  Certainly.  I'm going to start with
24   the government and then obviously I will certainly hear
25   you.
```

1          So, Mr. O'Regan.

2                  MR. O'REGAN:   Your Honor, taking Special Agent

3      Ambrogio's affidavit as true for the purpose of this

4      hearing and then taking also the defendant's own

5      statements in his post-arrest statement, the government

6      submits that there is more than a preponderance of

7      evidence to demonstrate that he's a risk of flight and

8      more than substantial evidence that he is a danger to the

9      community.

10          Your Honor, at some point the defendant, who's now

11     23, came under the sway of ISIS, or as we know it ISIL,

12     and he adopted at that point in his young life an

13     extremist form of Islam in which it called for acts of

14     terror against people who didn't believe as he did in this

15     extremist form of Islam and as a result of that he

16     developed a hatred for America.  And that hatred deepened

17     and deepened until he came to espouse the most vile and

18     horrific beliefs and this led him to the most unimaginable

19     statements.

20          We've mentioned this in our memorandum in which he

21     says -- he talks about a dead American solider that he's

22     put on his Facebook page and he said "Thank you, Islamic

23     state.  Now we don't have to deal with these Kafir back in

24     America."  Kafir meaning non-believers.

25              And then not just dealing with Americans, he then

talks about the attack on a beachside resort in Tunisia.
He said, "Awesome.  Awesome.  You know that, ah, that
brother in Tunisia was impressive.  He got like 38, 39
people, one guy.  That is a huge accomplishment I think."

So the defendant under the sway of ISIS/ISIL and
developing a hatred for America came to espouse those most
unbelievable thoughts about killing Americans and innocent
individuals around the world.

He then accepted ISIL's call to action and decided to
commit acts of terror here in the United States.  He
dedicated himself to killing as many innocent people in
the United States as he could and he began to put his own
plan of action into play, first by figuring out how can I
kill as many innocent people as I can and coming up with a
plan to kill people in different venues, and eventually
settling on probably the most representative one setting
off a bomb in a college cafeteria at lunchtime where as
many people, innocent people as possible could be killed.

He then went about implementing the plan by acquiring
the materials needed to make the bomb or the bombs in
order to kill these innocent people.  And perhaps the most
representative of what he was doing was buying a pressure
cooker so that he could emulate the Boston Marathon
bombers, the Tsarnaev brothers, and he referenced them on
a couple of occasions as people who had committed acts of

1   terror themselves using these pressure cookers, and he

2   said that he knew how to do it with black powder and with

3   nails and with ball bearings and with broken glass and

4   that he had come up with a way to set it off as well.

5        But it wasn't just the pressure cooker bomb, it was

6   also what he was creating at his own home which he claimed

7   were ten firebombs.  In fact, he described a mixture that

8   was similar to what's known as a Molotov cocktail in which

9   accelerant is mixed with Styrofoam and then put in a glass

10  jar and there's some sort of a rag and you light the rag

11  and you throw it against the wall and it all explodes, but

12  in his case he was proud of the fact that he was mixing

13  the accelerant with Styrofoam because it would stick to

14  the victims' skin and make it harder to put out because

15  you couldn't get it off.

16       It wasn't just the pressure cooker bomb and the

17  Molotov cocktails, he also wanted guns and so when he was

18  talking to the person who was cooperating with the

19  government he said, you know, I'll take care of the bombs,

20  you get the guns.  He even made a laundry list of what he

21  wanted in terms of firearms and he kept talking to the

22  confidential witness or the cooperating witness about

23  getting those firearms and continuing, I'll get the bombs

24  and you get the firearms.

25       So eventually, you know from the complaint, that on

1    July 4th of this year the defendant met with the

2    cooperating witness for the purpose of accepting delivery

3    of these firearms that he ordered, and they met in Adams.

4    The cooperating witness picked him up and they drove to an

5    empty parking lot.  The defendant took the duffel bag

6    filled with the firearms and put it into his lap and was

7    very excited, very enthusiastic.  He had his firearms now,

8    including two rifles and two handguns, including an AK-47

9    which is -- did I say AK-47?  Yes.

10            THE COURT:  I don't believe there was an

11   AK-47.

12            MR. O'REGAN:  I'm sorry, he asked for an AK-47,

13   it was an AR-15, a similar kind of a firearm used

14   frequently in military and criminal applications, and the

15   idea was that he was going to shoot innocent people, and

16   on a number of occasions he talked about, you know, we'll

17   fight and we'll die.  He wasn't afraid to die, and this

18   echoes so poignantly the many other attacks that we've had

19   in our country in the last few years, most recently the

20   black church in Charleston you know where someone goes in

21   in a completely innocent environment and kills innocent

22   people and this is what Mr. Ciccolo was planning to do.

23       As you know, he was arrested after he had taken

24   delivery of those firearms that he had ordered and he was

25   carrying them, slinging them over his shoulder as he was

1    walking back to his apartment.

2         After he was arrested, he was interviewed and you saw

3    what I'll call a representative portion of the interview

4    which lasted over an hour and a half, and I can represent

5    to the Court that it's pretty consistent the whole way

6    along.  We didn't just cherry-pick out something that was

7    not representative of the rest of the interview.

8              THE COURT:  And he was given his *Miranda* rights

9    before he spoke with the agents if I remember correctly?

10             MR. O'REGAN:  Yes, that's right.  At the very

11   beginning Special Agent Ambrogio explained before we can

12   speak, we need to advise you of your rights.  He read him

13   his rights.  The defendant signed the waiver and agreed to

14   speak with them, and the interview went pretty much in the

15   way that you heard it and saw it in a fairly gentle way.

16   This was not a hard-hitting interview or interrogation.

17   This was a talk to us, tell us what's going on.  We need

18   to try and protect people and we want to know what's

19   happening, what you are going to do with these firearms.

20        The defendant said I don't want to talk about the

21   firearms, but he was willing to talk about ISIS and ISIL.

22   And if one thing is clear from that portion, he was

23   continuing to affirm his belief in ISIL and continuing to

24   affirm their acts of terrorism against innocent people

25   defending them over and over again, including the killing

1    of women and children if the women and children were

2    fighting ISIL.

3        So we have a defendant who came under the sway of

4    ISIL, adopted a hatred for America, adopted the most vile

5    beliefs, began to act on them, was arrested and then

6    continued.  It wasn't as if he said, oh, they got me, gee,

7    maybe I made a mistake.  It was no, I'm here and this is

8    what I believe.

9        He was then taken to a holding facility, the Franklin

10   County Jail, and he was being processed into that facility

11   the standard way that all prisoners are processed.

12   There's a medical person that goes in and administers a

13   tuberculosis test to make sure that the inmates don't have

14   tuberculosis, and he picked up a pen and he slammed the

15   pen down on the top of the nurse's head so hard that the

16   pen actually broke in half.

17            THE COURT:  Did he say anything about why that

18   happened?  Why he did that?

19            MR. O'REGAN:  No.  And fortunately the human

20   skull is an incredibly protective structure because

21   without that this nurse would have been very, very

22   seriously injured, and you see from the exhibit in our

23   memorandum that it clearly punctured the skin on the top

24   of her head.

25        That tells us, Your Honor, that the defendant

1   continues to want to harm innocent people, will take any

2   opportunity -- in this case it was the first innocent

3   person that he met that he was able to attack and he took

4   whatever he could find as a weapon, in this case a pen,

5   and tried to inflict very serious physical harm on her.

6        So the government believes that there are no

7   combination of conditions that you could develop for the

8   defendant that would ensure his return to court or to

9   protect danger to the community.

10        THE COURT:  A little bit more on risk of flight,

11  does he have the means to leave the area?  I don't have

12  much information about his personal circumstances, in part

13  I think that's because he has not volunteered much

14  information about his personal circumstances, but I wonder

15  if there's anything else the government would say on that

16  point.

17        MR. O'REGAN:  Well, we don't believe that he has

18  substantial financial resources.  The real question is if

19  you tell him to stay put, is he going to stay put?  Is he

20  going to listen to you?  Is he going to follow your

21  orders?

22        This is a person who was willing to kill innocent

23  Americans who even after he was caught and was in jail

24  tried to attack a jail employee.  It's hard to believe --

25  it's just not reasonable to believe, it's not logical to

1    believe that just because you tell him you've got to stay

2    in this place where you're going to be in this residence

3    with a bracelet or whatever, that he's going to do that.

4        His belief is in ISIL and his terrorist attitude

5    remains, and if he's free and has an opportunity to flee,

6    the bracelet on his ankle is not going to stop him.

7                THE COURT:  Thank you.

8                MR. O'REGAN:  May I have a moment?

9                THE COURT:  Yes.

10               MR. O'REGAN:  Ms. Shukla reminded me about the

11   probable cause part of the argument and we have indicated

12   in the affidavit and in the memorandum and certainly in

13   the complaint that the defendant was convicted of a felony

14   and that he was clearly in possession of firearms on July

15   4, 2015 and that those firearms had traveled in interstate

16   commerce, those are elements of the crime for which he was

17   convicted.

18               THE COURT:  Thank you.

19        Mr. Hoose.

20               MR. HOOSE:  Thank you very much, Your Honor.

21        You know, we came into this hearing not contesting

22   probable cause as to this charge, the charge that he is in

23   court on today, what we all in this courthouse call the

24   922(g) charge.

25        A lot of what you heard and a lot of what you will

1    hear about this goes well beyond the 922(g) charge.   I

2    can't very well defend Mr. Ciccolo on charges that are not

3    even extant yet.   I don't know what they're going to be.

4    I don't know if the government even knows what they're

5    going to be, and so I would ask the Court to focus on the

6    charge that brings him here today.

7         I stipulated to probable cause on this because I

8    wanted to focus this Court's attention on the ultimate

9    question which Mr. O'Regan has just addressed and which is

10   whether or not there are any conditions which would secure

11   his presence, his return to court, and the safety of the

12   community and I suggest that there are.

13        Before I get to that, I want to just comment on the

14   government's case as to probable cause because I think

15   that while I stipulate that there is probable cause, I

16   think there are a couple of points that need to be made.

17        First of all, a lot of what -- well, what we heard

18   beyond Agent Ambrogio's affidavit was this excerpt from an

19   interview and I would suggest that what you learn from

20   that interview is that Mr. Ciccolo at the time of his

21   interview expressed some beliefs that are not in the

22   mainstream that may be deemed vile by Mr. O'Regan and may

23   be deemed vile by others, but they are nothing more than

24   beliefs, which is what was expressed in that interview.   I

25   have no doubt that many people will find them offensive.

1        I want to also draw the Court's attention to the fact

2    that I think all of us who come to this courthouse and

3    litigate in this courthouse would say that the 922(g)

4    charge, we refer to it always in the shorthand as a felon

5    in possession case, and that the government's case as to

6    felon in possession here really is a construct.

7        He was -- he received a continuance without a finding

8    on an operating under the influence charge in the North

9    Adams District Court and because that is punishable by --

10   although a misdemeanor under state law, it is punishable

11   by more than one year in jail it qualifies under 922(g) as

12   a predicate felony.  So it doesn't detract from the fact

13   that, as I said, there is probable cause, but I think it's

14   worth mentioning how the probable cause is established.

15           THE COURT:  And I take that point and I thought

16   about that, but the other side -- I think the other side

17   of that here is that under the Bail Reform Act I look at

18   the -- you know, I'm required under factors to look at the

19   nature and circumstances of the offense charged and I

20   think that means the surrounding circumstances of

21   possessing the firearm, which I did think opens the door

22   to consideration of the evidence that the government has

23   put forth in the affidavit, primarily the information the

24   government put forth in the affidavit.

25           MR. HOOSE:  I wasn't suggesting that you

1      shouldn't consider it, Judge.  I think that what our

2      dispute is is how much weight it's entitled to in the

3      Court's ultimate determination here.  Because the other

4      thing that I want to point out and the reason why I

5      emphasized that this was a misdemeanor under state law,

6      which he accepted a continuance without a finding on as

7      thousands of people have done in this Commonwealth, is --

8              THE COURT:  And he violated probation and was

9      ultimately convicted, but anyway.

10             MR. HOOSE:  Right.  The possession of weaponry

11     here are weapons that were provided by the FBI at no cost

12     to the defendant.  There is no indication that he ever

13     possessed weapons prior to that.  He has no record of

14     convictions.  There is reference to two knives.  I don't

15     believe that either of them, or maybe three knives, that

16     either of them were illegal under state law.

17         He has no record of conviction for weapons.  He has

18     no record of conviction for violence.  He has no defaults

19     on his record that I can recall for --

20             THE COURT:  I think that's true.

21             MR. HOOSE:  -- his appearances in court.

22         So much is made of the unfortunate attack on this

23     nurse at the Franklin County House of Correction.  I am

24     authorized to tell you that Mr. Ciccolo feels bad about

25     that and he regrets it.  I think to read anything like

1     what the government is attempting to read into that is

2     really taking this for more than it's worth.

3           This is a young man who was incarcerated, found

4     himself incarcerated for the first time in his life and

5     committed a compulsive and angry act.  I don't ask the

6     Court to excuse him for it.  I do suggest that it would be

7     inappropriate to read anything more into it other than

8     that.

9           So what I would suggest that this Court can and

10    should do is the following:  His mother and stepfather are

11    in the courtroom here this afternoon.  They were here at

12    his initial appearance before this Court.

13          Mr. Ciccolo is extraordinarily close to his mother.

14    He has a very strong relationship with her, and whatever

15    he may be accused of or thinking about doing or planning

16    to do, I feel entirely comfortable in assuring you that he

17    would do nothing that would put his mother in harm's way,

18    endanger her, or put her at risk in any way, which

19    certainly would happen if he were to flee after being

20    released into her custody.

21          One of the things that the Court is authorized to do

22    under Section 3142 is to release him in the custody of a

23    person who would assure his appearance and his remaining

24    confined under the conditions that the Court sets.

25          I would suggest that Mr. Ciccolo can be released to

1    the custody of his mother and his stepfather, again both

2    of whom are in the courtroom.  They live in a very remote

3    part of Berkshire county.  There would be no way for him

4    to get ready access to mass transportation or anything

5    else if he were to decide to cut off a GPS bracelet and

6    made a break for it.

7        Obviously part of the conditions would be that he be

8    on electronic monitoring and on GPS monitoring with a

9    strict 100 percent curfew.  If he walks out the front door

10   of his house, he would be subject to arrest.  It would be

11   a strict house arrest that he remain in the custody of his

12   mother's home at all times, no exceptions for anything.

13       I think that the Court could also add as a

14   restriction that he not be allowed access to the internet;

15   that he not be allowed to possess any computer or

16   electronic device.  Drugs and alcohol are not an issue for

17   this young man.  He has been abstinent for well over a

18   year now.  The Court can order that he not own or possess

19   any weapons or anything other that would be capable of

20   harming someone.

21       So I think that this is a reasonable request.  It is

22   an approach that the Court can and should take which will

23   adequately secure his presence and secure the safety of

24   the community.

25       Simply put, I understand the accusations and I don't

1    mean to minimize them, nor does Mr. Ciccolo.  He

2    understands that he's accused of very serious things, but

3    I think the Court has to be able to segregate out what

4    part of this is beliefs and what part of this is actions

5    and what part of this is connected to charges that are

6    currently pending before this court.

7        I would suggest that the Court can enter an order of

8    release consistent with the terms that I have outlined and

9    do so with confidence that it will adequately protect the

10   public and secure his presence in court whenever he is

11   needed.

12             THE COURT:  Thank you.

13        (Off-the-record discussion with probation officer.)

14             THE COURT:  You know, I normally take a motion

15   like this under advisement.  I think I'm going to give the

16   parties -- obviously I thought about this, reviewed the

17   material before I came out on the bench, considered as

18   well the recommendation from probation and pretrial

19   services.

20        It's an unusual case for our court.  He is charged

21   with a 922(g) offense, but if you look at the nature and

22   circumstances of that offense, he accepted delivery of

23   four firearms with the intent of using them to commit an

24   act of domestic terrorism.  He was quite clear orally and

25   online that those were his intentions, that that's what he

1   was going to use those guns for; that he was going to use

2   them in an attack on students or some other people, so the

3   evidence on that charge is very strong.  He accepted the

4   guns from a cooperating witness.  I think that again the

5   government's case is strong.

6        In terms of his character and his history, I

7   understand beliefs are not -- even beliefs that are

8   repugnant, that's one of the things that's valuable and

9   important about this country is we do not put people in

10  jail for holding beliefs that we find difficult to accept

11  or difficult to understand, but his expressions of belief

12  really lead me to question whether he would have a

13  commitment to showing up in court.

14       You know, there is somewhere in the affidavit that he

15  has previously expressed to the cooperating witness that

16  if he couldn't obtain the things that he needed to commit

17  this attack, there was really no reason for him to stay.

18  And while I don't see that he has necessarily got ready

19  access to financial resources, I also don't see -- I see

20  expressions of the online expressions as reflected in the

21  affidavit and I think also in the statement that he made

22  of a commitment to a process that we would conduct here

23  and so I think his beliefs are important for that reason

24  only.  I think they reflect a possible lack of commitment

25  to participation in the court process that will, you know,

1   be unfolding.

2        So, you know, I don't think I can dismiss his attack

3   on the nurse even if he does apologize for it and I

4   appreciate that he does apologize for that.  Nonetheless,

5   he does appear to have some propensity you know face to

6   face to commit an act like that.  I think it's unusual and

7   of concern.

8        So because of his intention to commit acts of

9   terrorism, the nature and seriousness of the danger to the

10  community if he's released, those risks are great, and so

11  I think the government has met its burden of proof by

12  clear and convincing evidence that if he's released he

13  would be a risk to other persons and he would be a risk to

14  the community.

15       I am perhaps a little bit less persuaded on the risk

16  of flight but the burden of proof on the risk of flight is

17  only by a preponderance of the evidence, and, as I said, I

18  don't believe that he has the commitment to -- I believe

19  the beliefs he expressed are not consistent with a

20  commitment to voluntarily appearing in court, and for that

21  reason I do also find that the government has proved by a

22  preponderance of the evidence that he is a risk of flight

23  or a risk of non-cooperation in further proceedings.

24       I am going to order that he be detained pending trial

25  on the charge that's currently been made against him and I

1    will issue an order.

2         On the probable cause to believe that he committed

3    the offense that's charged, I do think I essentially heard

4    a concession by the defendant that on the 922(g) charge

5    there is probable cause to believe that the charge was --

6    that the offense was committed.  There certainly is

7    evidence in the affidavit that the offense was committed

8    and so I do believe that there is probable cause to

9    believe he committed the offense that's charged.

10        Is there anything else from the government this

11   afternoon?

12             MR. O'REGAN:  No, Your Honor.

13             THE COURT:  Thank you.

14        Mr. Hoose, is there anything else from the defendant

15   this afternoon?

16             MR. HOOSE:  No, Your Honor.

17             THE COURT:  Thank you very much.

18   **(Hearing recessed at 4:23.)**

19

20

21

22

23

24

25                  C E R T I F I C A T E

1

2

3          I, Alice Moran, RMR, RPR, CSR, Official Court

4    Reporter for the United States District Court for the

5    District of Massachusetts, do hereby certify that the

6    foregoing transcript constitutes, to the best of my skill

7    and ability, a true and accurate transcription of my

8    stenotype notes taken in the above-entitled matter.

9

10

11   Date:   July 17, 2015

12

13   /s/ Alice Moran

14   _____
     Alice Moran
15   Offical Court Reporter

16

17

18                  Alice Moran, CSR, RPR, RMR
                       Official Court Reporter
19                  300 State Street, Room 303D
                       Springfield, MA 01105
20                        413-731-0086
                    alice.moran@verizon.net
21

22

23

24

25